Conviction for murder; punishment, death.
The testimony in this case warranted the jury in finding appellant guilty, and in the assessment of the extreme penalty of the law. The testimony for the State showed appellant to be engaged in smuggling contraband across the Rio Grande River some twenty-five miles below El Paso. Mr. Scotten, deceased, was a Federal border patrolman. He was shot through the hip in a battle with smugglers, and later shot through the head, the skin around the hole in the head showing powder burns. His two army regulation 45 pistols, his ring, watch and flashlight were taken from his person. The killing was near a crossing on the Rio Grande, and on the Mexican side of the river was the village of San Ysidro where appellant lived. The battle between the officers and the smugglers occurred in the early morning on July 20, 1929. The officers were watching the crossings to prevent contraband entries and saw a man on horseback come across the river just before day. Upon being hailed and informed that the party were Federal officers, the man on horseback fired upon them and tried to escape on his horse. The officers returned the fire and the horse was killed. He was carrying a quantity of alcohol. The two officers then went down to another crossing, got two more men, and the four came back to the scene. As they were getting out of their car they were fired on from several directions. It was at this time that Scotten was shot through the hip. The officers, feeling themselves outnumbered, retreated and procured reinforcement. Upon their return to the car they found Scotten dead. A State witness who had known appellant well, described his rather peculiar clothes, and positively identified him as one of a party of men whom he saw going back from the scene of the shooting toward the river crossing after the battle. Griego, another State witness who lived in San Ysidro at the time, swore that appellant's business was smuggling, and he heard appellant say the night before the battle that he was going to take a load across the next morning on horseback. The next morning witness saw appellant and other Mexicans whom he named, in San Ysidro going toward the crossing, and presently heard shooting on the American side, and saw the same men come back across the river with two automatic *Page 351 
pistols, and appellant had a flashlight. The men were laughing about what they had done. They said they had killed a Federal officer. They further said he had fallen and crawled under the car, and they pulled him out by the belt, turned him over, found he was not dead, and they shot him in the head. Appellant also had one of the automatic pistols. Witness did not see appellant cross the river on the horse, but heard him say he did, and that he lost his hat when he tried to run away on the horse.
The State used two brothers named Rodriguez, whose father lived in San Ysidro at the time of the killing. As we understand the record, said witnesses then lived in El Paso, but were visiting their father on July 19, 1929. They heard the shooting the next morning, got up and went down to the river bank to a position where they could see what was going on, and both testified that they saw appellant across on the American side shooting with a rifle at a car up the road. Later, according to their testimony, appellant and other men came across to the Mexican side. Appellant had a 45 automatic pistol. They heard him tell the others that he appreciated what they had done, but that he did the killing and felt glad over it. Another witness testified that after this killing he and his brother were driving at night without lights on the American side of the river, and were stopped by some one waving a flashlight across the road. Three men, one of them appellant, held these witnesses up and took their property. One of these witnesses identified one of the robbers and called him by name. Their property was then returned, and members of the party turned the matter aside by saying that because witness had no lights on his car they thought the men to be Federals. Some one of the party said they had f_____d some Federal sons-of-bitches, and appellant said "Here is the flashlight of one of them, the Scotten flashlight." When appellant was arrested at the home of one Garcia in San Ysidro he was in a room up on top of a quantity of hay. No other person was in the room. The arresting party found in said room a 45 regulation automatic pistol with the number filed off so it could not be identified.
Appellant, as a witness, denied being present or taking any part in the battle, and claimed he spent that night on the road from Juarez to San Ysidro because of a disabled car in which he had gone to Juarez after groceries. He said he heard of the battle when he got back to San Ysidro. He testified that at the time of the shooting he was somewhere on the road between Juarez and San Ysidro and knew nothing of it. He denied being *Page 352 
a member of the party that held up and robbed the witness Parada, and denied making the statement that he had the flashlight of Mr. Scotten.
Appellant complains in bills of exceptions 2A and 3 of the rejection of testimony, in effect, that in February, 1932, appellant, who was an officer in Mexico, in company with other officers, arrested the father and brother of the two Rodriguez witnesses and took said party to Juarez, where they were tried and the father was acquitted, but the brother pleaded guilty and was given six months in jail. In his qualification to these bills the trial court certifies that both the Rodriguez witnesses denied any knowledge of the matters referred to, and that there was no testimony in the case showing or tending to show that said witnesses knew of the transaction in question.
We recognize the rule to be that the motives, animus or prejudice of any witness are material for inquiry and proof, and that any party to a trial has the right to prove facts which directly or indirectly show animus or prejudice on the part of any witness against him. There is no trouble about the rule. The trouble here is over what appears or rather does not appear to be the showing of such state of case as requires application of the rule. The bills of exception do not show where the Rodriguez witnesses lived in 1932, at the time of the alleged occurrence of the arrest of their relatives by appellant and other officers. The bills show that the father was discharged and the brother pleaded guilty. There is no showing that either of these witnesses were present at the trial, or that they knew of or had heard of the arrest or trial, or that appellant played any special or prominent part in such arrest or had anything unusual to do with it. The trial court certifies there was no such testimony. Neither of said witnesses was asked upon the trial whether he had any animus or ill-feeling toward appellant, nor was there any other testimony offered showing either directly or indirectly such facts as would lead to the conclusion that there was ill-feeling, prejudice or animus on the part of such witnesses.
Of course, the purpose of such proof is, as far as it would go, to cast doubt on the credibility of the Rodriguez witnesses and to that extent impeach them, but an inference can not rest upon nothing more substantial than another inference, and this is specially true when there appears as supporting inference number two only a third deduction. The first thing inferred would be enmity or ill-will on the part of the Rodriguez brothers. The inference of such ill-will would arise from their *Page 353 
knowledge of the fact that appellant, in company with a group of other officers, had arrested their relatives. There being no testimony showing either directly or indirectly any knowledge on the part of said witnesses of appellant's conduct in the matter, there can be nothing to support such inference of knowledge. Nothing else is suggested to cause prejudice, ill-feeling, dislike or enmity on the part of said witnesses. As far as we are able to appraise said bills of exception, they wholly fail to set out any action on the part of appellant, or those associated with him, in the arrest referred to, to indicate other than the ordinary discharge of a duty on the part of a group of officers. As far as we can tell they were acting entirely within the scope of their official duty in making the arrest. It is not shown that appellant filed any complaint, or that he took any part in the prosecution, or was a witness in same, or had anything whatever to do with it other than going as one of the party in making the arrest. Ill-will or ill-feeling on the part of some one related to the parties arrested, in such state of case, would seem to be rather a far-fetched inference itself.
We would hesitate to reverse a case upon no stronger showing of injury than the mere rejection of testimony offered to show hostility on the part of a witness, which testimony went no further than to show that the accused was one of a group of officers who had executed a warrant of arrest in a regular way upon a relative of the witness. The case of Burnett v. State, 53 Tex.Crim. Rep., is referred to. See also Link v. State, 73 Tex.Crim. Rep..
We do not think bill of exceptions No. 11 presents any error. If we understand the record, it was made known to the court after this case was on trial that appellant desired a recess in order that his attorney might have a conference with a group of witnesses in Mexico to ascertain what they knew about this case, and if possible to get them as witnesses. The record seems to support the proposition that permission to bring witnesses bodily across the river in order to use them as witnesses, was a matter entirely within the discretion of the Federal Immigration Department. The judge trying this case had no power or authority to compel said immigration officers to admit parties into the United States in order that they might be witnesses. The record shows, however, that the judge did stop the trial and grant to appellant's attorney the right to go to the Mexican side and interview his witnesses and make an effort to get them across the river. It was agreed *Page 354 
that a representative of the district attorney's office should accompany appellant's attorney to Juarez on the Mexican side, and that the witnesses should be interviewed by both parties together. It is further shown that out of the number of witnesses thus interviewed seventeen were agreed upon by the defendant's attorney and the State's attorney, and a list of their names was furnished the Federal Immigration Officer with a request to him to admit these seventeen witnesses provided all came together. It is further shown that seventeen witnesses did present themselves, but upon investigation the immigration officer found that five of the original seventeen had been withdrawn and five others substituted. He declined to let them come across. When this matter was made known to the trial court he declined to further pass the case and the trial proceeded. No effort had been made by appellant's attorney to take the deposition of these witnesses as is provided for out of State or foreign witnesses. We see no error on the part of the trial court in the matter.
There are a number of other bills of exception presenting minor complaints, all of which have been examined, and in none of which do we find any error.
The judgment will be affirmed.
Affirmed.
 ON MOTION FOR REHEARING.